USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/20/2026__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUAN CHENG et al.,

                                    Plaintiffs,

               -against-

ZHANG MEDICAL P.C. et al.,

                                    Defendants.

21-CV-06682 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiffs Guo Qiang Chen ("Mr. Chen") and Juan Cheng ("Ms. Cheng") underwent in vitro fertilization ("IVF") for the purpose of selecting the sex of their child. Defendant New Hope Fertility Center ("New Hope") administered the IVF procedure, including the testing and implantation of an embryo conceived through IVF. The embryo New Hope implanted appeared female in testing performed by New Hope. However, a sonogram performed while Ms. Cheng was pregnant revealed that the fetus was male. Plaintiffs bring claims of medical malpractice, negligence, fraud, intentional infliction of emotional distress, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, violation of the Deceptive Trade Practices Act, and loss of society against Defendants.[1] Currently before the Court is Defendants' motion for summary judgment on all claims. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

---

[1] In addition to New Hope, Defendants include numerous affiliated entities and individual medical professionals involved in the events of this case.

1

## BACKGROUND

### I.    RELEVANT FACTS[2]

Plaintiffs are romantic partners who decided to have a child together in 2018.  J56.1 ¶¶ 1, 12.  Because Mr. Chen had two male children from previous marriages, Plaintiffs sought to have a female child.  *Id.* ¶ 2.  Plaintiffs pursued IVF "to provide themselves the best opportunity to select the gender of their child and have a female."  *Id.* ¶ 13.  After searching for IVF clinics in both China and the United States, Plaintiffs ultimately found Defendant New Hope, a clinic located in Manhattan, New York.  *Id.* ¶ 15.

During their search, Plaintiffs reviewed a Chinese language version of New Hope's website.  *Id.* ¶ 18.  The website advertised New Hope's "sex selection" services, stating "[m]ost who came to our hospital to perform a sex selection, mostly because of the imbalance in the family."  *Id.* ¶ 19.  The website outlined the following procedure for the sex selection services:

> The sperm and eggs from the parents, or sperm and eggs from a donor would be combined to produce an embryo. On the third day of development, you can start to begin the sex selection procedure. At this time the embryo already developed to six to eight cells. We will select from the embryo one or two cells to do a chromosome make up analysis. This way we can know whether the embryo is male or female. Only the embryo of the sex of your choice would be transplanted to the uterus.

*Id.*  The website also advertised the accuracy of the procedure.  It stated "[t]his is the most reliable technology or technique for sex selection. And the accuracy rate could reach 99 percent."

*Id.*  A different version of New Hope's website also contained a similar statement:

> The goal of the male, female proportion is the reason for the family. Most of the people who came to our hospital to choose genders is because they want the balance of the family….[T]he process of gender selection. From fathers' and mothers' sperm and egg or donors' sperms and eggs to make the embryo.

---

[2] The following facts are taken from the parties' Joint Statement of Undisputed Facts, Dkt. No. 132-1 (J56.1) and from the parties' declarations and exhibits.  The facts are either undisputed or described in the light most favorable to Plaintiffs.

2

On the third day of the development we can choose the gender…. At that time, the embryo has developed to six or eight cells. We take one or two cells from the selected embryo to get chromosome structure…for analysis…. By doing so, we know the gender of the embryo. Only the gender you want, the embryo would only be transplanted into the uterus. This is the most dependable gender selection technology. The accuracy is up to 99 percent.

*Id.* ¶ 20.

Plaintiffs decided that Ms. Cheng would undergo IVF at New Hope, in part because the staff was Chinese, which made it easier for Ms. Cheng, a Chinese national, to communicate. *Id.* ¶ 23; Dkt. No. 9 ¶ 2. On May 6, 2019, Mr. Chen visited New Hope and met with Defendant Zitao Liu ("Dr. Liu"), an obstetrician-gynecologist. J56.1 ¶¶ 5, 24. Mr. Chen testified that, at the meeting, Dr. Liu promised: "as long as your girlfriend's health is healthy, that is your girlfriend's health is good, it's guaranteed that you would have twin girls." Dkt. No. 132-19 at 72:22; 74:3–7.

In June 2019, Ms. Cheng came to the United States from China to begin treatment with New Hope. J56.1 ¶ 27. On June 17, 2019, Plaintiffs went to New Hope and again met with Dr. Liu. *Id.* ¶ 29. They also signed several consent forms, including a form titled "Patient Informed Consent" for "Preimplantation Genetic Screening (PGS) for Aneuploidy."[3] *Id.* ¶ 34. The Preimplantation Genetic Screening form stated "[t]here is a risk of **mis-selection of embryo(s) for transfer** into the uterus. This rare event could occur as a sample labeling and handling problem in the embryology laboratory. It is possible that an embryo assessed as chromosomally normal may still not implant or a **different (gender)** embryo may be selected for transfer and implant." *Id* ¶ 35.

---

[3] "Aneuploidy" is the scientific term for abnormalities in the number of chromosomes in a cell due to loss or duplication. In humans, aneuploidy could refer to any number of chromosomes other than the standard 46, and can be associated with chromosomal genetic conditions such as Down's Syndrome. It is not directly related to sex selection. *See, e.g.*, National Human Genome Research Institute, Talking Glossary of Genomic and Genetic Terms, https://www.genome.gov/genetics-glossary/Aneuploidy (last visited March 2, 2026).

At the conclusion of the first phase of Ms. Cheng's June 2019 IVF procedure, eight oocytes (commonly referred to as "eggs") were retrieved from her ovaries. *Id.* ¶ 41. Following fertilization with Mr. Chen's sperm, two resulting embryos were selected for genetic testing. *Id.* ¶¶ 44, 88. New Hope did not perform a needle biopsy of either embryo, which would have involved removing cells from the embryo and sending the cells to a lab to identify genetic abnormalities and sex of the embryo. *Id.* ¶¶ 42-43. Instead, New Hope tested the embryos using a method called "NICS." *Id.* ¶ 44. New Hope undertook the following steps to perform the NICS test: First, it assigned unique ID numbers to each of the embryos. *Id* ¶ 48. Second, the embryos were placed in a chemical mixture known as "culture media" in which the DNA from the embryos was tested. *Id.* ¶¶ 45-46. Third, the New Hope genetics laboratory assigned unique accession numbers to the samples. *Id.* ¶ 47. Fourth, the samples were placed in a machine called a "sequencer" that returned coded raw data. *Id.* ¶¶ 50-51. Finally, the data was input into a computer program developed by a company called Yikon Genomics. *Id.* ¶ 52.

On July 30, 2019, Yikon Genomics produced a report of the test results. *Id.* ¶¶ 56-57. The report stated that both of Plaintiffs' embryos were female, but only one had a normal number of chromosomes. *Id.* ¶¶ 56, 58. Ms. Cheng underwent a second round of oocyte retrieval in August 2019, but that round did not produce any female embryos with a normal number of chromosomes. *Id.* ¶¶ 66, 69. On December 31, 2019, New Hope began the process of preparing Plaintiffs' reportedly female embryo (from the June round of IVF) for a transfer to Ms. Cheng's uterus. *Id.* ¶ 70. New Hope first confirmed the information for the embryo, checking that its sex was noted to be female and that its ID correlated to the sample identified as female through NICS testing. *Id.* ¶¶ 71–72. The embryo was thawed and then transferred to Ms. Cheng's uterus on January 2, 2020. *Id.* ¶¶ 72–73. On January 9, 2020, New Hope administered

blood work which confirmed that Ms. Cheng was pregnant. *Id.* ¶ 74. She was transferred to the care of her obstetrician on February 10, 2020. *Id.* ¶¶ 75-76. On May 4, 2020, Ms. Cheng's obstetrician performed a sonography scan on the fetus, which revealed that it was male. *Id.* ¶ 76.

Mr. Chen informed New Hope of the results of the sonogram and Dr. Liu requested that the embryology lab confirm that the correct embryo was implanted. *Id.* ¶ 77. New Hope confirmed that the correct embryo was implanted. *Id.* ¶ 78. New Hope requested that the genetics lab also re-test a preserved sample from the transferred embryo. *Id.* ¶ 79. The Yikon Genomics report from the re-test again identified the transferred embryo as a normal female embryo. *Id.* ¶ 80. On May 11, 2020, Mr. Chen visited New Hope. *Id.* ¶ 81. He expressed to New Hope that he and Ms. Cheng sought to keep the infant even if it was male and/or not genetically their child. *Id.* ¶ 82. He was informed that the pregnancy could be terminated if they chose, because at the time of Mr. Chen's visit, Ms. Cheng was under 23 weeks pregnant. *Id.* ¶ 84. Both Plaintiffs testified in their depositions that they did not want to abort the pregnancy, with Mr. Chen stating that he considered the child to be "a gift from . . . God" and Ms. Cheng stating that every life is precious. *Id.* ¶¶ 85-86.

The embryo was tested by a non-party, which showed that the fetus had a greater than 99 percent chance of being the genetic offspring of Plaintiffs. *Id.* ¶ 87. In September 2020, Ms. Cheng gave birth in an uncomplicated delivery by Caesarean section. *Id.* ¶ 91. Her child was born healthy and did not have any abnormalities or developmental delays. *Id.* ¶¶ 91–93. Ms. Cheng subsequently conceived and gave birth to a healthy baby girl in 2024, with the assistance of a different fertility clinic. *Id.* ¶¶ 94–95.

## II.    PROCEDURAL HISTORY

Plaintiffs initiated this action on August 8, 2021.  Dkt. No. 3. Plaintiffs filed an Amended Complaint on August 17, 2021.  Dkt. No. 9.  On April 30, 2023, Defendant John J. Zhang ("Dr. Zhang") filed a Chapter 11 petition on behalf of Defendant Zhang Medical, P.C, which automatically stayed proceedings against it.  Dkt. No. 120.  On March 6, 2024, the parties informed the Court that the bankruptcy stay had been lifted.  *Id.*  The parties subsequently engaged in a settlement conference, which was unsuccessful.  Dkt. Nos. 124–25.  Defendants then moved for summary judgment on all claims, which Plaintiffs opposed.  Dkt. Nos. 132, 135, 140.

## DISCUSSION

## I.    LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Linton v. Zorn*, 135 F.4th 19, 30 (2d Cir. 2025). A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a judgment for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[4] The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Where, as here, the party opposing summary judgment bears the burden of proof at trial, summary judgment should be granted if the moving party can 'point to an absence of evidence to support an essential element

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

of the nonmoving party's claim.'" *Gemmink v. Jay Peak Inc.*, 807 F.3d 46, 48 (2d Cir. 2015) (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995)).

In ruling on a motion for summary judgment, all evidence must be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in his pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "But [a] motion for summary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016).

## II.    DR. TAYLOR'S TESTIMONY IS ADMISSIBLE ON SUMMARY JUDGMENT

Plaintiffs raise, as a threshold matter, several challenges to the admissibility of the evidence in the record. The Court must address certain of these challenges to evidence it intends to rely on at the summary judgment stage because "[t]he evidence considered on summary judgment must generally be admissible evidence." *LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 205 (2d Cir. 2005). Plaintiffs bring their evidentiary challenges pursuant to Federal Rule of Civil Procedure 56(c)(2), which permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible

in evidence." Plaintiffs challenge the admissibility of three categories of documents: the expert reports of Dr. Hugh Taylor ("Dr. Taylor") (Dkt. Nos. 132-27 & 29), the declaration of Barbara Chau (Dkt. No. 132-26), and several of New Hope's internal records and consent forms (Dkt. Nos. 132-7–132-18). The Court addresses Plaintiffs' challenges only to Dr. Taylor's reports because this Opinion does not rely on the other challenged documents.[5]

Plaintiffs challenge the reports of Dr. Taylor primarily on the grounds that they do not comply with the requirements of Federal Rule of Civil Procedure 26.[6] Plaintiffs specifically contend that the September 16, 2024 report and affidavit is inadmissible because: (1) it does not include a list of publications Dr. Taylor authored in the previous 10 years as required by Rule 26(a)(2)(B)(iv), and (2) the September 16, 2024 affidavit contains new material disclosed after the close of expert discovery.[7] Dkt. No. 135 ("Plaintiffs' Memorandum of Law in Opposition to Summary Judgment" or "Opp.") at 5–6.

Rule 26(a)(2) governs the timing and required contents of expert disclosures. Pursuant to Rule 26(a)(2)(B)(iv), an expert report must contain, *inter alia*, "the witness's qualifications, including a list of all publications authored in the previous 10 years." Rule 26(a)(2)(D) sets forth the timing requirements for the disclosure of expert testimony "[a]bsent a stipulation or a court order." Defendants do not dispute that Dr. Taylor's report failed to include the list of

---

[5] Plaintiffs are, of course, free to re-raise any of their other challenges if Defendants seek to introduce these documents into evidence at trial.

[6] Defendants submitted an initial report from Dr. Taylor on May 31, 2023. Dkt. No. 132-27. On March 18, 2024, Defendants submitted an updated version of Dr. Taylor's report. Dkt. No. 132-29. On September 16, 2024, Defendants submitted an affidavit of Dr. Taylor, which attached the March 18, 2024 report. *Id.* Defendants have since withdrawn the May 31, 2023 report.

[7] Plaintiffs also argue that Dr. Taylor's report was based upon information that was not disclosed to Plaintiffs. Opp. at 6. The Court has already addressed that argument and deemed it unavailing. *See* Dkt. No. 144.

publications, nor that the September 16, 2024 affidavit was submitted after the court-ordered deadline for expert discovery.

Where a party has failed to comply with the requirements of Rule 26, "a court may impose sanctions under Rule 37, including precluding the expert testimony." *Hananburgh v. Metro-N. Commuter R.R.*, No. 13-CV-2799 (JMF), 2015 WL 1267145, at *8 (S.D.N.Y. Mar. 18, 2015). Courts consider the following factors when deciding whether to preclude an expert witness under these circumstances: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Id.* (quoting *Design Strategy, Inc. v. Davis,* 469 F.3d 284, 296 (2d Cir. 2006)).

Here, the relevant factors weigh in favor of allowing Dr. Taylor's testimony. Plaintiffs focus on the third factor, arguing that they are prejudiced by the untimely disclosure of Dr. Taylor's September 2024 affidavit because it contains "new matter which Defendants have prevented Plaintiffs from responding to because expert discovery has closed[.]" Opp. at 6. In support of that argument, Plaintiffs submit an annotated version of the affidavit that identifies the alleged new information. *See* Dkt. No. 136-2. However, the information Plaintiffs identify as prejudicially "new" largely mirrors information that was previously disclosed in Dr. Taylor's March 2024 report, the timeliness of which Plaintiffs do not dispute. Opp. at 6. For example, Plaintiffs identify the statement in the September 2024 affidavit that Plaintiffs "agreed to have their embryos tested either through biopsy or through the NICS embryo culture media method" as new information. Dkt. No. 136-2 at 3. However, Dr. Taylor made essentially the same statement in his March 2024 report. *See* Dkt. No. 132-27 at 2 (Declaring that "plaintiffs initially

9

consented to preimplantation genetic testing of their embryos through the traditional biopsy method. After that, they agreed to have their embryos tested either through biopsy or through embryo culture media").

Dr. Taylor's September 2024 affidavit does provide one piece of information that was not included in his March 2024 report. Dr. Taylor's affidavit states that "Dr. Liu explained . . . that NICS was a new test which needed more clinical information[.]" Dkt. No. 132-29 at 4. This statement mirrors information provided by Dr. Liu in his testimony, *see* Dkt. No. 132-23 at 50:11–20, and was thus already a known part of the record in this case and addressable by Plaintiffs in their expert and rebuttal reports. Because Plaintiffs had access to Dr. Liu's testimony, and because Dr. Taylor's September 2024 affidavit explicitly attributes the statement to Dr. Liu (rather than adopting the statement as his own),[8] the Court does not find prejudice to Plaintiffs. As to the other factors, given the centrality of Dr. Taylor's testimony to the defense of this case, Defendants' explanation that Dr. Taylor's March 2024 report and the substance of his September 2024 affidavit were timely disclosed, and that trial has not yet been scheduled, these factors weigh in favor of allowing Dr. Taylor's report, including the September 2024 affidavit, to be considered in connection with Defendants' summary judgment motion.

---

[8] Obviously, Dr. Taylor was not present when Dr. Liu explained the NICS test to Plaintiffs, and so any testimony from him about what Dr. Liu said would be hearsay. However, there is no suggestion in Dr. Taylor's September 2024 affidavit that he is stating this information with firsthand knowledge; indeed, the affidavit is clear that he reviewed the records in this case, including deposition transcripts, to form his opinions, and statements of others are properly attributed to their speakers. *See* Dkt. No. 132-29 ¶¶ 3, 4, 10. Experts are permitted to rely on the record evidence and to testify about what evidence they relied on in forming their opinions. *See, e.g.*, Fed. R. Evid. 703.

III.    **SUMMARY JUDGMENT IS DENIED AS TO PLAINTIFFS' MEDICAL MALPRACTICE AND LACK OF INFORMED CONSENT CLAIMS, PLAINTIFFS' FRAUD-BASED CLAIMS, AND PLAINTIFFS' DECEPTIVE BUSINESS PRACTICE CLAIM**

Turning to the substance of Plaintiffs' allegations, Plaintiffs raise a number of claims concerning Defendants' decisions and actions in their medical treatment of Plaintiffs: medical malpractice (Count Seven), lack of informed consent (Count Five), fraud (Counts One, Two, and Three); and a claim related to deception in Defendants' advertising of their services (Count Twelve). Material factual disputes as to each of these claims preclude summary judgment and the Defendants' motion on these six claims must be denied.

### A. Medical Malpractice

First, Plaintiffs allege that Defendants engaged in medical malpractice in treating Plaintiffs. To establish a claim of medical malpractice under New York law, the moving party must establish: "(1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury." *Ongley v. St. Lukes Roosevelt Hosp. Ctr.*, 725 F. App'x 44, 46 (2d Cir. 2018) (quoting *DiMitri v. Monsouri*, 754 N.Y.S.2d 674, 675 (2d Dep't 2003)).[9]

Plaintiffs allege that Defendants engaged in medical malpractice because they did not "exercise the care expected of an expert fertility service provider to their patients," which resulted in Plaintiffs' "severe physical and emotional distress." Dkt. No. 9 ¶¶ 130, 132. This claim—to the extent it is premised on Ms. Cheng's physical injuries—survives summary judgment because the parties have introduced conflicting expert testimony over whether

---

[9] Both parties apply New York law to this case. *See e.g.,* Dkt. No. 134 ("Mot.") at 5; Opp. at 19. Because "[t]he parties' briefs assume that New York substantive law governs the issues" in this case "such implied consent is, of course, sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

Defendants "depart[ed] from good and accepted medical practice" in administering the NICS test without advising Plaintiffs as to its lesser accuracy. *Powers v. Mem'l Sloan Kettering Cancer Ctr.*, No. 20-CV-02625 (LGS), 2022 WL 874846, at *3 (S.D.N.Y. Mar. 24, 2022) (quoting *Anyie B. v. Bronx Lebanon Hosp.*, 5 N.Y.S.3d 92, 93 (1st Dep't 2015)).

### 1. A Triable Issue of Fact Exists On Deviation from Accepted Medical Practice

On a motion for summary judgment as to medical malpractice, a defendant bears the initial burden of making "a prima facie showing that 'in treating the plaintiff, he or she did not depart from good and accepted medical practice.'" *Id.* Once the defendant has made such a showing "the burden shifts to the plaintiff to rebut the defendant's showing by raising a triable issue of fact as to both the departure element and the causation element." *Id.* (quoting *Gilmore v. Mihail*, 105 N.Y.S.3d 504, 506 (2d Dep't 2019)). "[W]here there are conflicting expert opinions, the granting of summary judgment is inappropriate." *Kurtz v. Hansell*, 664 F. Supp. 3d 438, 465 (S.D.N.Y. 2023), *aff'd sub nom. Kakar Kurtz v. Lawson*, No. 23-7548-CV, 2025 WL 39860 (2d Cir. Jan. 7, 2025).

Defendants have met their initial burden of making a *prima facie* showing that they did not depart from good and accepted medical practice. In addition to the fact testimony of the medical professionals involved in Plaintiffs' care, Defendants rely on the expert opinion of Dr. Hugh S. Taylor, the Chief of Obstetrics and Gynecology at Yale-New Haven Hospital, and Chair of the Department of Obstetrics, Gynecology and Reproductive Sciences at the Yale School of Medicine. Dkt. No. 132-29 at 8. Dr. Taylor opined that Defendants did not engage in medical malpractice because "the care rendered by the defendants," including the use of NICS testing, "was within good and accepted practice of reproductive medicine." *Id.* Dr. Taylor's report specifically addressed Defendants' use of NICS testing. Comparing NICS testing to an embryo biopsy, Dr. Taylor explained that "[i]n 2019, both methods were not 100% accurate for detecting

12

embryonic abnormalities and gender of the embryo" and "[w]hether using either the culture media or biopsy method of preimplantation genetic testing, there is always the risk of obtaining inaccurate results because of limitations of the machinery and/or programming provided by the manufacturer." *Id.* at 9. In other words, any testing method employed by Defendants ran the risk of producing an inaccurate result. This testimony is sufficient to meet Defendants' *prima facie* burden to show that either in using the NICS testing method or in implanting a male embryo that they believed was female, they did not depart from accepted medical practice.

Plaintiffs have also met their burden of raising "a triable issue of fact as to both the departure element and the causation element." *Powers*, 2022 WL 874846, at *3. Plaintiffs provided the expert report of Dr. Alexander Kotlyar ("Dr. Kotlyar"), a staff physician at Genesis Fertility and Reproductive Medicine P.C. and assistant professor at the State University of New York, Downstate School of Medicine. Dkt. No. 133-25. Dr. Kotlyar opined that "the defendant used a less accurate method of genetic material sampling, non-invasive chromosome screening (NICS), for the purpose of PGT-A for sex selection and did not properly disclose this to the plaintiffs," thus departing from accepted medical practices. *Id.* at 2.

Competing expert opinions, either of which could be credited by the jury, raise a triable issue of fact as to the first element of Plaintiffs' medical malpractice claim: whether Defendants departed from acceptable medical practice. *Kurtz*, 664 F. Supp. 3d at 465.

### 2. Plaintiffs Allege Legally Cognizable Injuries as to Which There Are Genuine Disputes of Material Fact

Defendants argue that, despite Dr. Kotlyar's testimony, Plaintiffs cannot establish the causation required to set forth a claim for medical malpractice because they have not alleged a legally cognizable injury. The Court disagrees as to Ms. Cheng's alleged physical injuries. Defendants' argument relies on the New York Court of Appeals' decision in *O'Toole v.*

*Greenberg*, 64 N.Y.2d 427, 432 (1985), which held that "it cannot be said, as a matter of public policy, that the birth of a healthy child constitutes a harm cognizable at law." Mot. at 25. The Court agrees that under *O'Toole*, the emotional injuries that Plaintiffs claim from the birth of a healthy son when they would have preferred (and believed they would be giving birth to) a daughter are not legally cognizable. However, here, Plaintiffs also allege physical injuries stemming from Defendants' actions. Dkt. No. 9 ¶ 132. The Court of Appeals' decision in *O'Toole* does not foreclose recovery for these injuries.

In *O'Toole*, the Court of Appeals considered whether a couple could recover damages for "the expenses involved in caring for and rearing their expected child" who was conceived after Plaintiff Susanne O'Toole had undergone a surgical birth control procedure. *O'Toole*, 64 N.Y.2d at 430. The court held that those damages were not recoverable because "the birth of a healthy child, as but one consequence of defendant's tortious conduct, does not constitute a harm cognizable at law." *Id.* at 432. The court expressly cabined its holding to those particular damages; it noted that Plaintiffs also sought to recover for "the expenses incurred for the pregnancy, delivery and postpartum care rendered to plaintiff Susanne and the child." *Id.* at 430. But, the court explained, those damages were "not at issue on this appeal" because Defendant had conceded in its briefing that "that plaintiffs state legally cognizable claims for the physical and emotional injuries suffered by Susanne O'Toole as a result of the unwanted pregnancy [and] medical expenses associated with the pregnancy." *Id.* at 430 n.2. Similarly, both the Second and Fourth Department have found that a party can recover damages "for physical pain and suffering resulting from her unanticipated pregnancy," *Weintraub v. Brown*, 470 N.Y.S.2d 634, 641 (1983), and from "the physical injury and pain occasioned by [a party's] unanticipated pregnancy," *Sorkin v. Lee*, 434 N.Y.S.2d 300, 303 (1980), in cases of wrongful birth.

While not directly analogous, these cases suggest a general principle that where a party's pregnancy results from a physician's malpractice, the party can recover damages for physical injuries associated with the pregnancy even where the pregnancy resulted in the birth of a healthy child. In her deposition, Ms. Cheng described the following physical injuries as resulting from her fertility treatment or pregnancy: "fluid in the abdomen," "pain in the abdomen," and "weight gain" during her IVF procedures; "difficulty sleeping" and damaged eyes during pregnancy; and the need for a C-section to deliver her child. Dkt. No. 132-20 at 96:12–97:22. These are all physical injuries attributable to Ms. Cheng's fertility treatment or pregnancy and not to the subsequent birth of her healthy child.

The record in this case creates a genuine dispute of material fact over whether Defendants' alleged malpractice was the proximate cause of these physical injuries. When asked whether the physical injuries she described would have equally affected Ms. Cheng had she been pregnant with a girl, Ms. Cheng testified "[i]f it was a girl, I would have been willing to go through this suffering." *Id*. at 126:18–19. Based on this testimony, a jury could reasonably conclude that, if Defendants did deviate from accepted medical practice in administering the NICS test, that deviation was the proximate cause of Ms. Cheng's injuries. Similarly, a jury could reasonably conclude that had she known of the alleged lesser accuracy of the NICS test, or had Defendants used different testing and accurately told Plaintiffs that there were no viable female embryos, Ms. Cheng may not have undergone this particular pregnancy at all, or at least not without obtaining further testing of the embryos. Because "the issue of whether a doctor's negligence is more likely than not a proximate cause of a plaintiff's injury is usually for the jury to decide," *Kurtz*, 664 F. Supp. 3d at 469, summary judgment is denied as to Plaintiff's medical malpractice claim.

15

## B. Lack of Informed Consent

Plaintiffs also bring a claim for medical malpractice based on Defendants' failure to obtain informed consent. "To succeed in a medical malpractice cause of action premised on lack of informed consent, a plaintiff must demonstrate that (1) the practitioner failed to disclose the risks, benefits and alternatives to the procedure or treatment that a reasonable practitioner would have disclosed and (2) a reasonable person in the plaintiff's position, fully informed, would have elected not to undergo the procedure or treatment." *I.M. v. United States*, 362 F. Supp. 3d 161, 203 (S.D.N.Y. 2019) (quoting *Orphan v. Pilnik*, 15 N.Y.3d 907, 914 N.Y.S.2d 729, 940 N.E.2d 555, 556 (2010)). The record in this case establishes a genuine dispute of material fact as to each element of this claim.

As to the first element—the required disclosures—there is a triable issue of fact as to whether a reasonable medical practitioner would have disclosed either (1) alternatives to the NICS test or (2) that it was a potentially experimental or less accurate procedure. In his expert reports, Dr. Kotlyar opined that Defendants did not obtain Plaintiffs' informed consent because they "did not describe the risks and benefits of embryo biopsy and NICS" and "did not discuss the inferior performance of NICS[.]" Dkt. No. 132-30 at 2. There is some evidence in the record that Defendants did, in fact, discuss the performance of the NICS test: Dr. Liu testified that he explained to Plaintiffs that NICS is "a new test and we need more information regarding this [test]." Dkt. No. 132-23 at 50:11–20. However, the record does not establish whether Defendants described the risks and benefits of NICS as compared to an embryo biopsy. Furthermore, the jury would be entitled to evaluate Dr. Liu's testimony in light of Mr. Chen's testimony that, when he met with Dr. Liu in May of 2019, Dr. Liu promised: "as long as your girlfriend's health is healthy, that is your girlfriend's health is good, it's guaranteed that you would have twin girls." Dkt. No. 132-19 at 72:22; 74:3–7. Whether a reasonable practitioner

16

would have made additional disclosures and whether Dr. Liu sufficiently explained the performance of the NICS test, particularly in light of prior statements (assuming the jury credits Mr. Chen), are questions for the jury.

As to the second element—Plaintiffs' decisions had they been fully informed—there is a triable issue of fact as to whether a reasonably prudent patient would have consented to NICS testing, or consented to implantation of the NICS-tested embryo, had they been fully informed of its alleged lesser accuracy when compared to an embryo biopsy. For this element, "[t]he test is an objective one—what a reasonably prudent person in the plaintiff's circumstances would have decided if reasonably informed." *Godinez-Torres v. United States*, No. 14-CV-1097 (CBA) (PK), 2016 WL 11670284, at *10 (E.D.N.Y. Mar. 31, 2016) (quoting *Davis v. Nassau Ophthalmic Servs., P.C.*, 648 N.Y.S.2d 454, 456 (2d Dep't 1996)). Here, a jury could reasonably conclude that, had Plaintiff been informed of the lesser accuracy of the NICS test as compared to an embryo biopsy, Plaintiff would not have gone through with the implantation of an embryo that had only been tested through the NICS method.

Finally, a Plaintiff seeking to establish a claim for lack of informed consent "must also prove that the lack of informed consent is a proximate cause of the injury or condition for which recovery is sought." *I.M.*, 362 F. Supp. 3d at 203. For substantially the same reasons as set forth above in connection with Plaintiffs' medical malpractice claim, there is a genuine dispute of material fact over whether the alleged lack of informed consent is a proximate cause of Plaintiffs' legally cognizable injuries. A reasonable and properly-instructed jury could find in Plaintiffs' favor on each element of the lack of informed consent claim, and this precludes granting summary judgment for Defendants on this claim.

17

### C.  Fraud Claims

Plaintiffs' first three causes of action against Defendants all sound in fraud: fraudulent inducement (Count One), fraudulent concealment (Count Two), and intentional misrepresentation (Count Three).   Under New York law, fraudulent inducement and intentional misrepresentation are essentially the same claim, which requires a plaintiff to prove a material factual misrepresentation that is knowingly false, reasonable reliance by the plaintiff, and resulting damages.  *Deluca v. GPB Auto. Portfolio, LP*, No. 19-CV-10498 (LAK), 2020 WL 7343788, at *14 (S.D.N.Y. Dec. 14, 2020) ("Under New York law fraudulent inducement and fraudulent misrepresentation have identical elements of proof and can be treated together as common law fraud."); *JGV Apparel Grp., LLC v. Abu*, No. 22-CV-09210 (GHW) (JLC), 2024 WL 2093046, at *7 (S.D.N.Y. May 8, 2024) ("To prove fraudulent inducement under New York law, the plaintiff must establish by clear and convincing evidence (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [plaintiff]; and (iv) resulting damages.").  Similarly, fraudulent concealment under New York law requires plaintiffs to show by clear and convincing evidence "(1) that the defendant failed to disclose material information that he had a duty to disclose, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Grill v. Philip Morris USA, Inc.*, 653 F. Supp. 2d 481, 494 (S.D.N.Y. 2009) (quoting *Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n,* 192 F.3d 250, 258 (2d Cir. 1999)).

Defendants contend that these claims must all be dismissed because they rely on substantially the same facts and theories that Plaintiffs advance on their medical malpractice and informed consent claims, and thus the fraud-based claims either fail on their merits or should be

18

dismissed as duplicative.[10]   Mot. at 6-10.   The Court agrees that the facts and theories supporting the Plaintiffs' fraud-based claims are substantially the same as those underlying the malpractice and consent claims.   However, for the reasons discussed above, those claims do not fail on their merits at the summary judgment stage.   Because the malpractice and consent claims will proceed to trial, and because the treatment of this type of duplicative claim, or alternative theories of liability or recovery, is a matter for trial (whether in the form of Plaintiffs' election of claims and theories, proper instruction to the jury regarding consideration of duplicative counts, proper instruction to the jury regarding avoidance of cumulative damages, or otherwise), Defendants' motion for summary judgment on the fraud-based claims is denied.   *See Cohen v. Schroeder*, 248 F. Supp. 3d 511, 519 (S.D.N.Y. 2017), *aff'd,* 724 F. App'x 45 (2d Cir. 2018) ("[T]he 'baseline rule' is that 'a plaintiff is generally permitted to plead and prove his or her case on alternative and sometimes inconsistent theories of liability.'") (quoting *Thieriot v. Jaspan Schlesinger Hoffman, LLP*, No. 07-CV-5315 (DRH) (AKT), 2016 WL 6088302, at *5 (E.D.N.Y. Oct. 18, 2016)).

### D.  New York General Business Law § 349

Plaintiffs allege that Defendants violated New York's Deceptive Trade Practices Act, New York General Business Law § 349, by "advertising of one accurate method of testing and switching to an inferior, less accurate method of testing."   Opp. at 26.   "To maintain a cause of action under § 349, a plaintiff must show: (1) that the defendant's conduct is consumer-oriented; (2) that the defendant is engaged in a deceptive act or practice; and (3) that the plaintiff was injured by this practice."   *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010).

---

[10] Defendants also argue that damages on these claims, if they survive, must be limited to pecuniary damages.  Mot. at 10.  The Court need not resolve this now, as this is an issue for trial, whether as a motion *in limine* or proposed instruction to the jury.

19

Defendants primarily argue against this claim by disputing that the clinic's "up to 99% accurate" claim is deceptive as a matter of law. Mot. at 23. The Court agrees. *See Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) ("Deceptive acts are defined objectively as acts likely to mislead a reasonable consumer acting reasonably under the circumstances."). However, it is conceivable that where the Defendants' advertising focused on the type of testing done to achieve this accuracy, the language used could be found deceptive by a jury. Thus, summary judgment is inappropriate.

Based on the undisputed record in this case, Defendants advertised "[w]e will select from the embryo one or two cells to do a chromosome make up analysis" and "[w]e take one or two cells from the selected embryo to get chromosome structure . . . for analysis." J56.1 ¶¶ 19–20. Although these advertisements do not specify a particular testing method by name, and the record does not indicate that a "chromosome make up analysis" only refers to an embryo biopsy and not an NICS test, the record is clear that a NICS test does <u>not</u> involve removing cells from the embryo as described in the Defendants' advertising.[11] In light of these facts, the question of whether a reasonable consumer would be likely to read Defendants' advertisements as promising a particular method of testing, and whether Plaintiffs' injuries are fairly traceable to reliance on any such deception are classic jury questions. Accordingly, Defendants' motion for summary judgment as to the New York General Business Law § 349 claim is denied.

## IV.   SUMMARY JUDGMENT IS GRANTED FOR DEFENDANTS ON PLAINTIFFS' CONTRACT CLAIMS, AND PLAINTIFFS' CLAIMS FOR BATTERY, NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND LOSS OF SOCIETY

---

[11] Indeed, this is partly why the NICS test presents fewer risks to embryonic integrity and quality than biopsy testing, because it does not remove cells and instead tests the DNA secreted by the embryo into the culture medium.

### A. Contract and Quasi-Contract Claims

Defendants also move for summary judgment on Plaintiffs' three contract or quasi-contract claims: breach of contract, breach of the implied covenant of good faith and fair dealing, and, in the alternative, unjust enrichment (Counts Nine, Ten, and Eleven). Because Plaintiffs cannot establish that these claims can exist alongside their medical malpractice claims on the present record, Defendants are entitled to summary judgment on these claims.

#### 1. Breach of Contract

Plaintiffs allege that Defendants not only engaged in medical malpractice but also breached their contract with Plaintiffs by failing to provide successful sex selection services. Under New York law, "a breach of contract claim arising out of the rendition of medical services by a physician will withstand a test to its legal sufficiency only where it is based upon an express special promise to effect a cure or to accomplish some definite result." *La Russo v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 302 (S.D.N.Y. 2013), *aff'd*, 747 F.3d 90 (2d Cir. 2014). Here, the record establishes that Defendants did not provide an "express special promise" to provide "definite result[s]" in their sex selection process. *Id*. Rather, Defendants expressly declined to promise a definite result based on these services. It is undisputed that Plaintiffs asked Defendants to "put in the contract that the girl is guaranteed" and Defendants refused to do so. J56.1 ¶¶ 36–37. No reasonable jury could find that Defendants made an enforceable contractual promise to guarantee a female embryo or female child as a result of their sex selection services under this set of facts. Accordingly, summary judgment is granted to Defendants on Plaintiffs' breach of contract claim.[12]

---

[12] To the extent Plaintiffs argue that Dr. Liu's alleged verbal promises reflect an "express special promise to effect a cure or to accomplish some definite result," *La Russo*, 936 F. Supp. 2d at 302, any such statements are barred from consideration as part of Plaintiffs' breach of contract claim by the parol evidence rule. Mr. Chen testified that, when he met with Dr. Liu in May of 2019, Dr. Liu promised: "as

21

## 2. Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs' breach of the implied covenant of good faith and fair dealing claim also must be dismissed as duplicative of their breach of contract claim. "Under New York law, a claim for breach of the implied covenant of good faith and fair dealing 'should be dismissed if it is duplicative of an insufficient breach of contract claim.'" *Schandler v. New York Life Ins. Co.*, No. 09-CV-10463 (LMM), 2011 WL 1642574, at *9 (S.D.N.Y. Apr. 26, 2011) (quoting *Blessing v. Sirius XM Radio Inc.*, 2010 WL 4642607, *12 (S.D.N.Y. Nov. 17, 2010)). Plaintiffs do not identify any specific behavior by Defendants that breached the implied covenant of good faith and fair dealing. Rather, they allege that Defendants breached this duty by "accepting the benefits provided to them by Plaintiffs while attempting to withhold Defendants' obligations on the contract." Dkt. No. 9 ¶ 151. Because Plaintiffs do not identify any actions by Defendant that breached this duty other than those that arose under the contract, and because, as explained above, the breach of contract claim cannot proceed to trial, Plaintiffs do not set forth a claim for breach of the implied covenant of good faith and fair dealing under New York law.

---

long as your girlfriend's health is healthy, that is your girlfriend's health is good, it's guaranteed that you would have twin girls." Dkt. No. 132-19 at 72:22; 74:3–7. However, Plaintiffs do not dispute that they subsequently signed a consent form that stated: "[i]t is possible that an embryo assessed as chromosomally normal may still not implant or a different (gender) embryo may be selected for transfer and implant." J56.1 ¶¶ 29–35. Where, as here, "the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations or agreements offered to contradict or modify the terms of their writing." *Adler & Shaykin v. Wachner*, 721 F. Supp. 472, 476 (S.D.N.Y. 1988). Because Dr. Liu's alleged promise contradicts the terms of the parties' written consent agreement, it cannot be considered as part of Plaintiff's breach of contract claim. Additionally, Plaintiffs allege that Defendants breached a "promise to use the trophectoderm biopsy method of embryo testing." Opp. at 24. That allegation again fails to meet the requirement that Defendants made "an express special promise to effect a cure or to accomplish some definite result." *La Russo*, 936 F. Supp. 2d at 302.

### 3. Unjust Enrichment

Plaintiffs' unjust enrichment claim also fails at the summary judgment stage because the factual record shows it is entirely duplicative of their medical malpractice claims. A party is "restricted from pleading unjust enrichment in connection with an alleged medical malpractice" where "the same events give rise to both actions." *Carofino v. Forester*, 450 F. Supp. 2d 257, 266 (S.D.N.Y. 2006). In their opposition brief, Plaintiffs argue that their claim for unjust enrichment should not be dismissed because they "trusted New Hope, trusted New Hope not to lie to them, trusted New Hope to provide the gender selection services they paid in advance for." Opp. at 24. These allegations are based upon the same set of events as those underlying Plaintiffs' medical malpractice claim and summary judgment is granted to Defendants on this claim as well.

### B. Battery

Plaintiffs allege that Defendants engaged in battery (Count Six) because Plaintiffs "consented to the transfer and touching of their female embryo" but not "the transfer and touching of a different embryo." Opp. at 20. In the context of medical malpractice, battery applies "only where the patient or her guardian gives *no* consent and the doctor intends to cause a bodily contact that a reasonable person would find offensive." *Armstrong ex rel. Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 134 (2d Cir. 2005). In contrast, when a doctor "obtains consent without giving the patient appropriate information concerning risks and alternatives," that action serves as the basis for an informed consent claim rather than a battery claim. *Id.* Here, Plaintiffs' allegations fall into the category of an informed consent violation rather than a claim for battery because the record is devoid of evidence that Defendants "intend[ed] to cause a bodily contact that a reasonable person would find offensive." *Id.* The parties do not dispute that Plaintiffs consented to an embryo transfer and that Defendants

23

performed an embryo transfer.  Opp. at 20.  Rather, Plaintiffs allege that they did not consent to the transfer of a non-female embryo.  Nothing in the record indicates that Defendants or Plaintiffs were aware that the transferred embryo was not female.  Thus, Defendants could not have "intend[ed] to cause a bodily contact that a reasonable person would find offensive." *Armstrong ex rel. Armstrong*, 425 F.3d at 134.  Defendants are therefore entitled to summary judgment on Plaintiffs' battery claim.

### C. Negligence

Plaintiffs also bring a negligence claim (Count Eight) based on the same set of facts that support Plaintiffs' medical malpractice claims.  Medical malpractice is "a species of negligence." *Gjini v. United States*, No. 16-CV-3707 (KMK), 2019 WL 498350, at *9 (S.D.N.Y. Feb. 8, 2019).  Accordingly, a court assessing a negligence claim in the medical context must look to "the nature of the duty to the plaintiff which the defendant is alleged to have breached." *Redd v. Garell*, No. 18-CV-09436 (JCM), 2023 WL 2712373, at *12 (S.D.N.Y. Mar. 30, 2023).  "When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence." *La Russo*, 936 F. Supp. 2d at 304.  Here, Plaintiffs specifically allege that their negligence claim stems from Defendants' duty to "exercise reasonable care in their treatment of Plaintiffs." Dkt. No. 9 ¶ 135. They further claim that the duty "arises out of the common law doctor-patient relationship and/or the common law duty of reasonable care." *Id.*  Plaintiffs' own allegations state that the duty at issue in their negligence claim "arises from the physician-patient relationship or is substantially related to medical treatment." *La Russo*, 936 F. Supp. 2d at 304. Accordingly, Plaintiffs' negligence claim sounds in medical malpractice and not negligence and therefore must be dismissed.

### D. Intentional Infliction of Emotional Distress

Plaintiffs' claim for intentional infliction of emotional distress (Count Four) cannot survive summary judgment because the record fails to establish that Defendants exhibited conduct that rises to the standard for emotional distress under New York law. "Under New York law, to prove a claim of intentional infliction of emotional distress, a plaintiff must establish '(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress.'" *Noonan v. New York City Police Dep't Officer Carlos Becker*, No. 14-CV-04084 (LTS) (JLC), 2017 WL 3638201, at *5 (S.D.N.Y. Aug. 23, 2017) (quoting *Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996)). "To satisfy the outrageousness element, the alleged conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Lea v. McNulty*, 212 N.Y.S.3d 152, 156 (2024).

Plaintiffs allege that Defendant satisfied these requirements by "directing their attorney to threaten to have Plaintiffs arrested; overcharging fees; attempting to prevent Plaintiffs from telling the public about Defendants' botched transplantation procedure; and denying Defendants' responsibility for the harm suffered by Plaintiffs." Dkt. No. 9 ¶ 106. In their opposition brief, Plaintiffs focus on their allegation that Defendants' attorney threatened to call the police and have Plaintiffs arrested. Opp. at 19. This conduct does not rise to the level of acting "beyond all possible bounds of decency" as required to establish a claim for emotional distress. *Lea*, 212 N.Y.S.3d at 156; *see also Goldstein v. Dansk Int'l Designs, Ltd.*, No. 86-CV-06519 (MGC), 1987 WL 9421, at *3–4 (S.D.N.Y. Apr. 8, 1987) (holding that Defendant's behavior, which included "threatening to call the police should [plaintiff] fail to return the company car" failed to meet the "stringent standard" required to establish claim for intentional infliction of emotional

25

distress); *Marino v. Jonke*, No. 11-CV-00430 VB, 2012 WL 1871623, at *11 (S.D.N.Y. Mar. 30, 2012) ("[F]alsely pursuing the arrest and criminal prosecution of an individual . . . has been held not to constitute intentional infliction of emotional distress."); *Columbo v. Philips Bryant Park LLC*, No. 22-CV-775 (RA), 2024 WL 1138942, at *19 (S.D.N.Y. Mar. 15, 2024) ("[M]ere threats, annoyance or other petty oppressions, no matter how upsetting, are insufficient to constitute the tort of intentional infliction of emotional distress."). Even if a jury fully credited Plaintiffs' version of events, the conduct cannot meet this standard as a matter of law. Accordingly, summary judgment for Defendants is granted on this claim.

### E. Loss of Society

Plaintiffs bring a claim on behalf of Mr. Chen for the loss of "society, company, and support of his partner, Plaintiff Ms. Cheng" (Count Thirteen). Dkt. No. 9 ¶ 168. Although alleged as a claim for "loss of society," this claim appears to be for a loss of consortium. *See Man Zhang v. City of New York*, No. 17-CV-05415 (JFK), 2018 WL 3187343, at *11 (S.D.N.Y. June 28, 2018), *aff'd sub nom. Zhang v. City of New York*, No. 23-7469-CV, 2025 WL 485392 (2d Cir. Feb. 13, 2025) (noting that "under New York law, 'loss of society' is merely a part of a 'loss of consortium' claim"); *Goldman v. MCL Companies of Chicago, Inc.*, 131 F. Supp. 2d 425, 427 (S.D.N.Y. 2000) ("The common law concept of consortium includes not only loss of support or services of a husband or wife; it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more."). "An action for loss of consortium cannot be maintained unless the plaintiff was married to the injured person at the time of the actionable conduct." *Briggs v. Julia L. Butterfield Mem'l Hosp.*, 104 A.D.2d 626, 626, 479 N.Y.S.2d 758, 758 (1984). It is undisputed that Plaintiffs' allegations concern events that took place in 2019-2020 and that Plaintiffs did not marry until 2024. J56.1 ¶¶ 28, 75; Opp. at 26. Because the Plaintiffs were not married at the time of the alleged conduct, Plaintiffs cannot bring a claim for

loss of consortium as a matter of law, and Defendants' motion for summary judgment on Count Thirteen is granted.

## V.    PLAINTIFFS' CLAIMS AGAINST THE CATHERINE FOUNDATION ARE NOT DISMISSED

Finally, Defendants move to dismiss all claims against Defendant The Catherine Foundation on the grounds that it is a non-profit that played "no role in the treatment of Plaintiffs." Mot. at 28–29. Plaintiffs oppose the motion, arguing that New Hope's records indicate that The Catherine Foundation was involved in the testing of Plaintiffs' embryos. Several of the records submitted by New Hope include the name of The Catherine Foundation in the headers at the top of the page. *See, e.g.*, Dkt. No. 132-7 at 2, 74. Because The Catherine Foundation's name is included in New Hope's records of Plaintiffs' care, and only Dr. Zhang's deposition testimony supports that they had "no role" in this case, a reasonable jury could conclude that The Catherine Foundation was involved in some way in Plaintiffs' treatment, including the aspects of that treatment central to this case (the testing of the embryos for sex selection purposes). Accordingly, The Catherine Foundation is not entitled to be dismissed from the case on summary judgment.

## CONCLUSION

Defendants' motion for summary judgment is DENIED as to Plaintiffs' medical malpractice and informed consent claims, fraud claims, and deceptive business practices claim,

27

and GRANTED as to all other claims.  The Clerk of Court is respectfully directed to

terminate Dkt. No. 132.

Dated: March 20, 2026
       New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge